IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ELIEL E. BROWN,                          )
                                         )
                Petitioner,              )      No C 03- 5410 JSW (PR)
                                         )
        vs.                              )      ORDER DENYING PETITION
                                         )      FOR A WRIT OF HABEAS
DAVID L. RUNNELS, Warden,                )      CORPUS
                                         )
                Respondent.              )
_____     )

**INTRODUCTION**

Eliel E. Brown, a prisoner of the State of California currently incarcerated at High Desert State Prison in Susanville, California, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Per order filed on April 20, 2004, this Court ordered Respondent to show cause as to seven claims raised in the petition.  Respondent filed an answer on November 24, 2004.  Petitioner filed his traverse to the answer on December 6, 2004.  This order denies the petition for writ of habeas corpus on the merits.

**PROCEDURAL BACKGROUND**

The parties agree on the following procedural history: on March 30, 2000, a jury in the Superior Court of the State of California in and for the County of Alameda found Petitioner guilty of second degree murder, with a personal firearm use enhancement.  On May 18, 2000, Petitioner was sentenced to a term of nineteen years to life in state prison.

Petitioner appealed to the California Court of Appeal, First District, which affirmed the conviction in a reasoned opinion filed on June 25, 2002.  On September 11, 2002, the Supreme Court of California denied a petition for review.

On November 18, 2002, Petitioner filed a writ of habeas corpus in the California Supreme Court restating several claims that he had raised on direct appeal and raising numerous additional claims.  On June 18, 2003, the Supreme Court of California denied the petition.  Petitioner filed the instant matter on December 2, 2003.

## STATEMENT OF THE FACTS

The facts of the case are summarized from the California Court of Appeal opinion as follows:

Appellant and Daydrien Lamont Lee were employed as movers at Nor Cal Moving Services (Nor Cal) in San Leandro. It is undisputed that at the end of the workday on September 15, 1997, appellant shot Lee multiple times, killing him. The question at trial was whether the killing was murder or manslaughter.

Prosecution's Case

On the day of the shooting, appellant and Lee were part of a ten-man crew who went to Stanford University for a moving job. They traveled from the company's main office in two trucks and a van. Appellant drove the van, and six or seven members of the crew, including Lee, rode with him.  Lee did not speak Spanish and was the only person in the van who was not primarily Spanish-speaking.

During the morning, Steve Martinez, one of the foremen, noticed some friction between Lee and appellant.  Lee was cursing and urging appellant to work faster. Appellant said to Martinez something like, "Tell this guy to get off my fucking back."  The animosity between appellant and Lee continued that afternoon, with the two men yelling and Lee complaining that none of the men were working fast enough.

When the crew left Stanford, they headed first to Nor Cal's Doolittle Drive warehouse to unload furniture for storage.  During the unloading, Lee continued to complain vehemently that the others were lazy.  Before long appellant and Lee were cursing at

each other, with Lee saying things like "mother fucker, ass holes, lazy." At some point appellant said, "'We [sic] going to resolve this. But this is not the time, and this is not the moment.'"

After the men finished unloading, Lee left the warehouse and rode with Martinez in one of the trucks back to the main office. According to Martinez, Lee was "ranting and raving" about appellant; he was particularly upset because appellant and others in the crew had delayed the unloading by stopping at McDonald's on the way from Stanford to the warehouse.

Meanwhile, Richard Margie, the other foreman, started to leave the warehouse in the other truck. Appellant and the other men who had been riding in the van flagged him down. Appellant was very agitated and irritated. He told Margie that Lee had stolen the keys to the van. Appellant was certain Lee had taken the keys because Lee's jacket was gone from the van and the keys were gone from the van's ignition. According to Jorge Garcia, one of the other movers, appellant said that the "fucking nigger" had taken the key. Appellant complained that he was "tired of all this shit, that always everybody wants to blame on Latin people that we're the lazies."

Rather than wait for someone to return the keys, Margie took appellant and the other men back to the main office in the truck. Margie could tell that appellant was really "pissed off" about the missing keys and tried to tell him to take it easy and forget it. When they arrived at the main office, appellant was still agitated and very upset. After appellant got out of the truck, Jorge Garcia saw him walk toward the dispatch office.

Lee was in the dispatch office with another Nor Cal employee, Robert Watson, checking on their assignments for the following day. Appellant came to the office door, a gun in his hand. Lee said, "It's cool man, it's cool." Appellant said something and started shooting. Watson ducked for cover. He heard at least five or six shots, one right after the other. When the shooting stopped, Watson locked the door, saw that Lee had been shot, and called 911.

Garcia saw the shooting from outside the office. He said that appellant pulled a gun from the small of his back and pointed it at Lee. When Lee saw appellant, he said "Hey, man, no. No, man. Sorry." Appellant said "Sorry madres," and fired a shot from a distance of five or six feet. Lee fell backward onto the floor and appellant started shooting again, firing several times. When he finally stopped shooting, he walked out of the building and headed toward his car. He said, "I'll see you tomorrow, primos," referring to his coworkers.

After receiving a dispatch about the shooting, Officer Brian Sommer found appellant's car parked in front of his apartment

3

complex. As Sommer watched, appellant approached, got into the car, and started to drive. Sommer stopped and arrested him. Sommer found a Ruger .9 mm semiautomatic pistol in appellant's car, on the front floorboard. The capacity of the gun's magazine was 10 rounds of ammunition, but there were no rounds in either the magazine or the chamber. Police also found a gun case on the rear floorboard, with a trigger lock inside the case. In the trunk were three 50-round boxes of ammunition, with some rounds missing from one box.

Police interviewed appellant on the night of the shooting, and a videotape of that interview was introduced into evidence; the record also includes transcripts of that interview. Appellant told the officers that he did not understand why the shooting happened; he had never had problems with Lee before. On the day of the shooting, he and Lee had "a discussion" and got "excited" and Lee said something bad about appellant's mother. Lee was angry because appellant and the others were speaking Spanish. Lee also wanted them to hurry up; he did not want to work overtime. Appellant said that he lost his mind when Lee talked about appellant's mother.

Appellant explained that he went to his car, took the loaded magazine from the glove box, took the gun from trunk, and inserted the magazine. He got the gun because he was angry and wanted to hurt Lee for what he had said, but "not very much." At the same time, he acknowledged that it was wrong to shoot Lee. He thought he fired three or four rounds, but did not think all the shots hit Lee. After shooting Lee, he went home, woke up his brother, and said he had "a problem."

Asked whether he had ever suffered any mental illness, appellant said that sometime between the ages of 10 and 13, when he was in Cuba, he had "a disease from the horses" and was "crazy" for two months, but after that has been okay.

According to the physician who performed the autopsy, Lee died of multiple gunshot wounds. He suffered 16 entrance wounds, including four on his head and face, five on the front side of his torso, one on his back, and several on his arms and hands.

Defense Case

Appellant's wife testified that she and appellant were married in Cuba over 15 years ago. She described him as a very loving and gentle and non-violent person, who maintained close contact with his mother in Cuba by telephone and letters and by sending money and presents. She said that in Cuba, a mother is always respected; insulting someone's mother is not allowed. She also said that appellant had complained of frequent headaches and sometimes has memory problems. Numerous defense witnesses testified that appellant was non-violent and that they had never

4

seen him strike anyone, act aggressively, or speak harshly.

Dr. Nell Riley, a clinical neuropsychologist, testified that she had evaluated appellant by conducting a clinical interview, administering approximately 20 psychological tests, and reviewing various records and documents. Appellant's medical records from Cuba indicated that in 1980, when he was 16, he was hospitalized with severe bacterial meningoencephalitis, with associated epileptic seizures and severe memory problems. Several years later, in 1988 and 1990, he had more seizures, but has had no seizures since then and no longer takes medication for epilepsy. Nevertheless, an electroencephalogram in 1999 revealed a "subtle nonspecific intermittent focal abnormality localized in the left temporal head region."

Dr. Riley concluded that appellant suffers from a neuropsychological impairment or organic brain disease or disorder that is "fairly diffuse," by which she meant that the impairment affected "a variety of different aspects of mental cognitive processing." Solving a problem takes appellant longer than it would an ordinary person, and his memory is poor. A person with organic brain damage may have a problem with decision- making because that person may process information slowly.

The court precluded Dr. Riley from testifying that symptoms of organic brain damage may include reduced impulse control. Before Dr. Riley testified, the court held a hearing under Evidence Code section 402 to consider the admissibility and relevance of her proposed testimony. Dr. Riley testified at that hearing about her conclusions that appellant suffered from a "post-encephalitic condition, generalized organic brain condition" and that he was impaired in a number of areas. She explained that persons with certain types of brain damage often display impulsivity or "episodic emotional discontrol," meaning an abnormally low ability to regulate one's behavior. Impulsive behavior is seen more frequently in brain-damaged persons. Asked to explain "neurogenic impulsivity," she said, "Impulsivity is sort of used in the standard . . . sense of--again, the same sort of basic idea of people who are less likely to be inhibited in their behavior, behaviors that could get them in trouble instead of suppressing them. [P] Like thinking you want to do that but be able to inhibit or suppress it.

The prosecutor acknowledged that evidence of mental defect may be relevant to whether a defendant actually premeditated and deliberated. He conceded that Dr. Riley could testify that appellant "suffered from some brain disorder and talk about the disorder somewhat." He objected, however, to any testimony that the disorder could result in "lack of . . . impulse control," reasoning that such testimony was a synonym for diminished capacity. Defense counsel argued that Dr. Riley should be allowed to testify about the effect of brain damage on

subsequent activity, and he assured the court that her testimony would not touch on the subject of diminished capacity.

The court ruled that Dr. Riley could not testify about episodic emotional discontrol, explaining that such evidence "does equate to diminished capacity" and would be "an attempt to diminish his capacity or his ability to form the proper intent for murder."

*People v. Brown*, No. A091940, slip op. 2-10 (Cal. Ct. App. June 25, 2002).

## STANDARD OF REVIEW

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. As summarized by the Ninth Circuit: "A state court's decision

6

can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000) *overruled on other grounds*; *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003) (citing *Williams*, 529 U.S. at 405-07).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must not only be erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).  In deciding whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of th Petitioner's claim in a reasoned decision.  *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Where the state court gives no reasoned explanation of its decision on a Petitioner's federal claim and there is no reasoned lower court decision on the claim, a federal habeas court should conduct an independent review of the record.  *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the

state court decision. *Williams* 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While the circuit law may be "persuasive authority" for the purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Id.*

In his petition for writ of habeas corpus, Petitioner asserts seven claims for relief: (1) the trial court violated his rights to due process and to present a defense by excluding evidence regarding the effects of his organic brain disease; (2) the trial court violated his rights to due process and to present a defense by erroneously excluding evidence regarding alleged prior violent acts committed by the victim; (3) prosecutorial misconduct deprived him of his Fourteenth Amendment right of due process; (4) the trial court's inclusion of a biased juror violated his Sixth Amendment right to an impartial jury; (5) a juror's inability to comprehend English violated his Sixth Amendment right to a fair trial; (6) the trial counsel's deficiencies deprived him of his Sixth Amendment right to effective assistance of counsel, and (7) the appellate counsel's deficiencies deprived him of his Sixth and Fourteenth Amendment right to effective assistance of counsel.

## DISCUSSION

### 1.    Trial Court's Exclusion of Defense Testimony

Petitioner alleges that the trial court violated his rights to due process and to present a defense by precluding Dr. Riley from testifying about the potential effects of Petitioner's organic brain disease. Petitioner alleges that Dr. Riley's excluded testimony would have established that he lacked malice, an element of the murder conviction.

At the trial court's hearing under California Evidence Code section 402, Dr. Riley testified that Petitioner suffered from a "post-encephalitic condition, generalized organic brain condition."  Reporter's Transcript ("RT"), Respondent's Exhibit B, 841.  Dr. Riley noted that the condition can lead to "impulsivity" or "episodic emotional discontrol," meaning an abnormally low ability to regulate one's behavior.  RT 849.

"The prosecutor acknowledged that evidence of mental defect may be relevant to whether a defendant actually premeditated and deliberated.  He conceded that Dr. Riley could testify that appellant 'suffered from some brain disorder and talk about the disorder somewhat.'  He objected,  however, to any testimony that the disorder could result in 'lack of . . . impulse control,' reasoning that such testimony was a synonym for diminished capacity." *Brown*, slip op. 9-10.  Defense counsel argued that Dr. Riley's testimony regarding the potential effects of brain damage on subsequent activity would be relevant to the specific intent element of the charges.  RT 825-826.

The trial court ruled that Dr. Riley could testify that Petitioner suffered from organic brain damage and could describe some of the consequences of such damage.  The court, however, precluded Dr. Riley from testifying that persons with brain damage can display impulsivity or episodic emotional discontrol.  The trial court reasoned that such testimony would be an attempt to diminish Petitioner's capacity or his ability to form the proper intent for murder, a violation of California Penal Code sections 28 and 29.  RT 869-870.

In considering the claim, the California Court of Appeal analyzed the difference between impermissible and permissible opinion testimony under California Penal Code Sections 28 and 29:

> "Sections 28 and 29 govern the admissibility of expert testimony on the effect of a defendant's mental disease or disorder.

Under sections 28 and 29, expert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form that mental state is inadmissible.  At the same time, those statutes permit introduction of evidence of a mental illness, defect, or disorder when relevant to whether a defendant actually formed a mental state that is an element of a charged offense.  "An expert's opinion that a form of mental illness can lead to impulsive behavior is relevant to the existence *vel non* of the mental states of premeditation and deliberation regardless of whether the expert believed [the defendant] actually harbored those mental states at the time of the killing." ( *People v. Coddington* (2000) 23 Cal.4th 529, 582-583, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

*Brown*, slip op. 11.  The court then discussed the holding of *People v. Nunn*, 50 Cal.App.4th 1357 (1996), finding it instructive on the issue of opinion testimony relating to a criminal defendant's mental state:

"The appellate court explained that under sections 28 and 29, it was permissible for the expert to testify that defendant's history of psychological trauma could cause him to overreact to stress and apprehension and to act impulsively under certain circumstances.  The expert could also have evaluated the psychological setting of defendant's encounter with the men and offered an opinion about whether it was the type that could result in an impulsive reaction from a person with defendant's mental condition.  What the expert could not do was conclude that the defendant had "acted impulsively, that is, without the intent to kill, that is, without express malice aforethought."  ( *People v. Nunn, supra*, 50 Cal.App.4th at p. 1365.)

*Brown*, slip op. 12.  The court then addressed the trial court's limitation on  Dr. Riley's testimony and found the exclusion was error under state law:

"While sections 28 and 29 foreclosed any testimony by Dr. Riley in this case about appellant's capacity to form the particular mental states at issue, the trial court's limitation on her testimony was unduly restrictive.  The court correctly allowed Dr. Riley to testify that appellant suffered from organic brain damage and to describe some of the consequences of such damage.  The court erred, however, when it precluded her from testifying that the disorder can result in impulsivity or episodic emotional discontrol.  At a minimum, the excluded evidence was unquestionably relevant to the premeditation and deliberation elements of the first degree murder charge.  ( *People v. Coddington, supra*, 23 Cal.4th at ¶. 582-583.) *People v. Nunn, supra*, 50 Cal.App.4th 1357, supports a conclusion that the excluded evidence also had at least some relevance to whether appellant acted with express malice, i.e., with

1    the intent to kill."

2    *Brown*, slip op. 12-13.  The Court of Appeal found that the error was not of

3    constitutional dimension.  The court stated that "[Petitioner's] defense was that

4    he acted without premeditation and deliberation and without malice, making his

5    crime manslaughter, not murder."  *Id.* at 14.   The court found that by restricting

6    Dr. Riley's testimony the trial court excluded some evidence relevant to this

7    defense but did not completely preclude petitioner from presenting that defense.

8    *Id.* at 16:

9         The trial court's limitation on Dr. Riley's testimony did not
          completely preclude him from presenting that defense.  The court
10        did permit Dr. Riley to testify in considerable detail about
          appellant's medical and family history, the results of her evaluation
11        and testing, her diagnosis that he suffered from neuropsychological
          impairment or organic brain damage, and certain of the symptoms
12        of that brain damage.  Other witnesses described their perceptions
          of appellant's mental state on the day of the shooting.  Richard
13        Margie testified that appellant had "weirded out" over the incident
          with the keys to the van.  Jorge Garcia described appellant as
14        seeming to be "in another world" when he pointed his gun at Lee.
          Steve Martinez said that appellant had "a staring look" on his face
15        after the shooting, as if he did not know Martinez was there and
          had just "wandered off" in his mind.  During appellant's interview
16        with police, he said repeatedly that he had lost his mind, lost
          control, could not explain what he did, lost his head, and was
17        crazy. Defense counsel emphasized during argument that
          appellant's state of mind and intent were at issue.  He relied on all
18        this evidence to urge that appellant would not have made a
          knowing judgment based upon careful thought and analysis,
19        weighing the consequences for and against, "whether or not to kill
          or not to kill . . . if he were thinking in his right mind."  He argued
20        that appellant's statements to the police after the shooting regarding
          his mental state were directly relevant to whether there was malice.
21        He urged that the evidence demonstrated that appellant was not
          thinking properly, that his actions were not those of a "rational
22        thinking person," that he was blinded by rage and did not know
          what was going on, that his thinking was "deranged" and not
23        consistent with malice, and that he had acted in the heat of passion.

24   *Brown*, slip op. 15-16.  The Court of Appeal concluded that because the

25   defendant was not completely deprived of presenting the defense that he acted

26   without the requisite intent, the error did not constitute federal constitutional

27

28                                        11

error.  Accordingly, the "harmless beyond reasonable doubt" standard as applied to federal constitutional error under *Chapman v. California*, 386 U.S. 18, 24 (1967) did not apply.  *Id.* at 13.

The court then evaluated the error under the less stringent state standard of review explained in *People v. Watson*, 46 Cal.2d 818, 835-836 (1956), "this court will reverse only if it finds a reasonable probability that a result more favorable to the defendant would have resulted absent the error."  *Id.*  The Court of Appeal explained that the effect of the error was reduced by Petitioner's conviction for second degree murder, instead of first degree: "[t]o the extent that the excluded evidence was relevant to premeditation and deliberation, its exclusion was of no consequence because the jury convicted [petitioner] of second degree murder, not first.  *Id.* at 16.

The court pointed out that under the instructions given, the jury's second degree murder verdict could have been based on either express malice or implied malice.  *Id.*  The Court determined that there was "overwhelming" evidence showing defendant acted with either express or implied malice when he shot Lee:

> "The overwhelming weight of the evidence indicated that when appellant shot Lee, he acted either with express or implied malice.  The evidence was undisputed that appellant and Lee had exchanged angry, hostile comments throughout the workday.  The evidence also was undisputed that appellant became extremely angry when he discovered that Lee had apparently taken the keys to the van; that anger persisted during the ride back to the Nor Cal main yard.  Witnesses to the shooting testified that appellant ignored Lee's attempt to apologize just before the shooting and that he shot Lee from a distance of only five or six feet.  After the first shot, when Lee fell backward to the floor, appellant shot him again repeatedly, inflicting multiple wounds to Lee's head, face, and body.
>
> Appellant's own account of the shooting established that after arriving at the yard, he walked a distance to his parked car, retrieved his gun case from the locked trunk, removed the Ruger from the case, took the magazine from the glove box, walked back to the office, and loaded the gun.  He acknowledged that he stood face-to-face with Lee, held his gun chest high with both hands,

fired at Lee, and kept shooting until the gun was empty.  He acknowledged that he was angry and wanted to hurt Lee. He said that he knew it was wrong to shoot a person and that he had made a mistake."

*Brown*, slip op. 17-18.   The court concluded that, due to the overwhelming evidence that Petitioner acted with either express or implied malice when he shot Lee, it was not reasonably probable that a result more favorable to the Petitioner would have been reached in the absence of the error.  *Id.* at 15-18.

### A.    Legal Standard

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984).  The exclusion of evidence constitutes a Due Process Clause violation only when "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996).  The defendant must therefore establish that his right to have the jury consider the excluded evidence implicated a "fundamental principle of justice."  *See id*.

One of the fundamental rights that may be violated by the erroneous exclusion of critical corroborative evidence is the right to present a defense guaranteed by the Sixth Amendment.  *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), and *Washington v. Texas*, 388 U.S. 14, 18-19 (1967)).

While the only definitive source of clearly established federal law is in the holdings of the Supreme Court as of the time the state court decision, circuit law may be persuasive authority for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent.  *Clark v.*

13

1 | *Murphy*, 331 F.2d 1062, 1069 (9th Cir. 2003).

2 |      The Ninth Circuit has developed a framework for deciding whether the

3 | exclusion of evidence violates the due process right to a fair trial or the Sixth

4 | Amendment right to present a defense under *Chambers* and its progeny. *Chia v.*

5 | *Cambra*, 360 F.3d 997, 1004-05 (9th Cir. 2004) (finding the exclusion of certain

6 | critical defense evidence an unreasonable application of clearly established

7 | federal law); *Drayden v. White*, 232 F.3d 704, 711 (9th Cir. 2000).  In evaluating

8 | such a claim, *Chia* instructs courts to balance the following five factors: (1) the

9 | probative value of the excluded evidence as to the central issue; (2) the reliability

10 | of such evidence; (3) whether it is capable of evaluation by the trier of fact; (4)

11 | whether it is the sole evidence on the issue or is merely cumulative; and (5)

12 | whether it constitutes a major part of the defense.  *Chia*, 360 F.3d 1004.

13 |      But even if the exclusion amounted to constitutional error, the erroneous

14 | exclusion of the evidence must have had "a substantial and injurious effect" on

15 | the verdict in order to justify federal habeas relief.  *Brecht*, 507 U.S. 619, 623

16 | (1993).  Habeas petitioners must therefore establish that the error resulted in

17 | "actual" prejudice.  *See id.*

18 |      **B.**    **Analysis**

19 |      Analyzing Petitioner's claim under the factors enumerated in *Chia*

20 | establishes that the Court of Appeal's decision finding no constitutional error

21 | was an unreasonable application of Supreme Court precedent. *See Chia*, 360

22 | F.3d at 1004.

23 |      Petitioner's defense was that he acted without premeditation and

24 | deliberation and without malice, making his crime manslaughter, not murder.

25 | *Brown*, slip op. 14.  Dr. Riley's testimony that organic brain disease can result in

26 | impulsivity was relevant to the issue of whether Petitioner acted with

27 | 

28 |

premeditation, deliberation and malice. *Id.* Accordingly, the precluded testimony constitutes a major part of Petitioner's defense.

The excluded evidence was reliable. Dr. Riley was an expert in neurology. She examined petitioner and administered valid neuropsychological tests. She was qualified to give an expert opinion as to a diagnosis of Petitioner's organic brain disease and its potential effects.

The excluded evidence was capable of evaluation by the jurors. If Dr. Riley's precluded testimony was introduced, the jury would have been called upon to assess Dr. Riley's testimony regarding the effects of Petitioner's brain disorder alongside other evidence showing whether or not Petitioner actually formed the requisite intent when he shot Lee. Such determinations are within the province of the jury as fact-finder.

Dr. Riley's excluded testimony was probative of the central issue in the case: whether Petitioner acted with express or implied malice. *Brown*, slip op. at 18-19. While the Court of Appeal found that Dr. Riley's precluded testimony was not specific to Petitioner, a review of the record shows that counsel made an offer of proof of Dr. Riley's written evaluation of Petitioner as testimony at trial, before the Court limited Dr. Riley's testimony at the 402 hearing. RT at 817-18. In Dr. Riley's evaluation, she found that episodic emotional discontrol and Petitioner's "neuropsychological dysfunction played a central role in his actions" on the date of the murder (Riley Evaluation at 8), *see,* Clerk's Transcript ("CT"), Respondent's Exhibit A, at 94-102, finding that the incident ("conditions of intense emotional arousal," *id.*) was the type that could result in an impulsive reaction from a person with Petitioner's impaired mental condition. *Nunn*, 50 Cal.App.4th at 1357. The testimony therefore had probative value on this central issue.

Notably, during deliberations, the jury requested that the trial court provide read-back of Dr. Riley's testimony, specifically requesting "the end of the testimony where she discussed test results [and] conclusions." In the same request, the jury asked the court to provide "clarification of [CALJIC] 3.32." CT at 174. Given the jury's request for read-back of Dr. Riley's conclusions and for clarification of the jury instruction which describes the effect to be given to such evidence, it is apparent that the jury considered this evidence at a minimum to some degree in rendering its verdict.

Dr. Riley's precluded testimony also was the sole evidence on this issue. While the trial court allowed Riley to explain certain symptoms of Petitioner's brain disease, the jury was unable to hear evidence of Petitioner's impulsivity or emotional discontrol. This was the best and only evidence that Brown possessed to substantiate his claim that he acted without malice. See *Chia*, 360 F.3d 1005. Accordingly, the trial court's limitation of Dr. Riley's testimony constitutes constitutional error and the state courts denial of the claim is an unreasonable interpretation of clearly established federal law. *Chia*, 360 F.3d 997 at 1005.

Habeas relief, however, would only be appropriate if the exclusion had "substantial and injurious effect" on the verdict. *Brecht*, 507 U.S. at 623. In determining the likely impact of a constitutional error, the reviewing court should review the strength of the prosecution's case. *Gray v. Klauser*, 282 F.3d 633, 653 n.16 (9th Cir. 2002), *vac'd on other grounds in Klauser v. Gray*, 537 U.S. 1041 (2002). Where properly-admitted evidence overwhelmingly supports a jury finding of guilt, a trial error will not be deemed to have had a substantial influence on a verdict. *Lawson v. Borg*, 60 F.3d 608, 613 (9th Cir. 1995) (noting that constitutional error could be "rendered insignificant by overwhelming evidence of guilt").

This Court agrees with the Court of Appeal that there was an overwhelming amount of evidence in the record showing that when Petitioner shot Lee, he was acting with either express or implied malice.  Throughout the workday,  Petitioner and Lee had exchanged hostile comments.   When he discovered that Lee had taken the keys to the work van, Petitioner became enraged.  Petitioner ignored his co-workers' advice to calm down on the ride back to the work yard.  Upon arriving at the work yard, petitioner walked to his car, grabbed his semiautomatic pistol from his trunk, loaded it and walked over to the dispatch office.  After entering the office, Petitioner ignored Lee's attempt to apologize and shot him from a distance of only five or six feet.  When Lee fell backward to the floor, Petitioner shot Lee again repeatedly, inflicting multiple wounds to Lee's head, face, and body.  After the murder, Petitioner admitted to police officers that when he got the gun he was angry and wanted to hurt Lee. *Brown*, slip op. 17-18.

In light of the overwhelming weight of evidence that Petitioner acted with malice when he shot Lee, it cannot be said that the trial court's limitation on Dr. Riley's testimony had a "substantial and injurious effect" on the verdict and resulted in "actual" prejudice.  *See Brecht*, 507 U.S. at 623.  Petitioner is therefore not entitled to federal habeas relief on this claim.

**2.**      **Exclusion of Evidence of Lee's Prior Violent Acts**

Petitioner contends that the trial court denied him his right to present a defense by excluding evidence of the prior violent acts of Lee, the victim. Before trial, the prosecutor filed a motion in limine to exclude introduction of evidence regarding Lee's alleged character for violence.  The prosecutor argued that because Petitioner had never made a claim of self-defense, evidence concerning Lee's prior bad acts should be excluded because it was irrelevant.

17

CT 109-110.  Defense counsel contended that the motion was "premature" because "whether or not those incidents should come into evidence would depend upon what testimony is presented and exactly what the testimony is."  RT 44.  Additionally, defense counsel maintained repeatedly that the relationship between Petitioner and Lee was relevant.  RT 45-49.

The trial court granted the prosecutor's motion in part.  The trial court ruled, that "unless there is going to be some evidence with respect to self-defense, we really don't need to get into the character of the victim with respect to his character traits for violence per se."  RT 49.  The trial court stated that before the defense could introduce evidence of Lee's prior bad acts, a hearing under California Evidence Code section 402 would be held to determine the relevance of such evidence.  RT 49-50.

The trial court found, however, that the relationship between Petitioner and Lee was relevant and that defense counsel could elicit information regarding the direct relationship between Petitioner and Lee.  *Id.*  The court acknowledged the potential for such testimony to "slide" into the area of prior bad acts.  RT 49-50.  Nevertheless, the trial court expressed its intention to deal with the issue "on a question and answer/objection basis.  *Id.*

### A.    Legal Standard

A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions.  *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).  States have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.  *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  While the U.S. Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence

permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. *Holmes v. South Carolina*, 126 S. Ct. 1727 (2006). Plainly referring to rules of this type, the United States Supreme Court has stated that the U.S. Constitution permits judges to exclude evidence that is only marginally relevant or poses an undue risk of prejudice. *Id.*

As noted previously, in order to determine whether there has been a constitutional violation in a case involving the exclusion of evidence, the court must balance the five factors set forth in *Chia v. Camra*, 281 F.3d at 1004. The court also must consider the state interests underlying the evidentiary rules. *Id.* at 1006. In order to establish a claim for relief, a petitioner must establish constitutional error, as well as show that the error had a substantial and injurious effect on the jury's verdict. *Brecht*, 507 U.S. at 623.

### B.    Analysis

Petitioner is unable to establish that his due process right to a fair trial or his Sixth Amendment right to present a defense were denied as a result of the trial court's decision to exclude evidence of Lee's prior violent acts. Evidence of Lee's prior violent acts did not play a central role in Petitioner's defense. Petitioner's defense was that he acted without premeditation, deliberation or malice, making his crime manslaughter, not murder. *Brown*, slip op. 14. Petitioner never asserted self-defense as a defense theory at trial.

The probative value of allowing Petitioner to inform the jury of Lee's violent acts would have been marginal at best. The mere fact that Lee had committed violent acts in the past was not relevant to the central issue in the case in that it did not have a tendency to prove or disprove whether petitioner acted without premeditation and deliberation and without malice.

19

The state's interest in excluding the evidence was strong. The state has an obvious interest in excluding irrelevant evidence. *See Chia*, 360 F.3d at 1004.

On this record, the trial court's decision to exclude Lee's prior violent acts did not amount to constitutional error, nor was the state court's exclusion was contrary to, or an unreasonable application of clearly established federal law. *See* 28 USC § 2254(d). Because the evidence was mostly, if not entirely, irrelevant, Petitioner is also unable to establish that excluding Lee's violent acts had a substantial and injurious effect on his ability to prevail at trial. *See Brecht*, 507 U.S. at 623.

**3.     Prosecutorial Misconduct**

Petitioner claims the prosecution's withholding of material evidence violated his due process rights under the Fourteenth Amendment. Petitioner alleges two separate instances of prosecutorial misconduct: (1) the prosecution failed to disclose material evidence when it intentionally deleted portions of Petitioner's videotaped and audiotaped statement to police after his arrest, which would have shown that Petitioner told the police that he was scared of Lee, that Lee had committed various prior violent acts, and that Lee "was going toward him when [Petitioner] pulled the gun from his waist and shot at [Lee]"; and (2) the prosecution withheld police reports that might have shown Lee's prior violent acts.

**A.     Legal Standard**

Due process requires the prosecutor to disclose information that might create a reasonable doubt, that is, information that might lead to discovery of favorable evidence "material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the

result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985): *see also United States v. Agurs*, 427 U.S. 97, 103-07 (1976) (holding constitutional standard of materiality imposes higher burden on defendant than ordinary harmless error standard).

In order to establish that the prosecutor's withholding of evidence constituted a due process violation, Petitioner must therefore prove three things: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

**B.     Analysis**

Petitioner's claim that the prosecution withheld police reports that might have shown Lee's prior violent acts is without merit because a review of the record clearly shows that the prosecution provided the defense with the police reports at issue.  At the pre-trial hearing on whether to exclude evidence of Lee's prior bad acts, defense counsel stated he had received the police reports at issue:

> "I think in regard to the police reports that have been provided to me by the district attorney's office regarding prior acts of violence, some of which involved guns, some of which involved assault on a police officer with an automobile, these things that I have learned about the complaining witnesses thorough district attorney police reports, I would agree that as to those items, we will have further discussion."

RT 46.  Given the fact that the record refutes Petitioner's assertion, Petitioner is unable to establish a due process violation on this claim.

As to the alleged deletion of Petitioner's statements to the police, a review of the record shows that the defense was involved in editing the videotape before it was shown to the jury.  RT 34-40.  The prosecution provided the defense with

a transcript of the interview. RT 42. Defense counsel stated that he would review the transcript and determine that if it was an accurate statement of what was on the audio or videotape. *Id.* Petitioner and his counsel viewed the videotape, along with the jury, and made no objection complaining that the tape provided was missing any necessary communications. RT 482, 490. Detective Willis authenticated the videotape as a true and accurate videotape of the interview. RT 490-491. Defense counsel, in fact, made repeated use of the tape in supporting the theory that Petitioner acted without malice aforethought when he killed the victim and that he was only guilty of voluntary manslaughter. *Brown*, slip op. 16.

Without some factual support, Petitioner's speculation that there were material parts of the interview left out is insufficient to merit relief. *See Wood v. Bartholomew*, 516 U.S. 1, 6-8 (1995) (suppression of evidence claim cannot be based on mere speculation without adequate support).

Petitioner also does not show prejudice under the standard of review applicable to *Brady* claims. *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (a violation will be found under Brady by simply showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict). No evidence on the record suggests that Lee was acting aggressively toward petitioner when he was shot. On the contrary, all witnesses to the incident testified that just before the shooting, Lee attempted to apologize; that Petitioner ignored Lee's attempt to apologize and shot Lee from a distance of only five or six feet; and after the first shot, when Lee fell backward to the floor, Petitioner shot Lee again repeatedly, inflicting multiple wounds to Lee's head, face, and body. In light of the overwhelming evidence tending to disprove petitioner's allegation of self-defense, there is no

1   reasonable probability that the result of the trial would have been different if

2   Petitioner had been able to introduce the portions of the videotape and audiotape

3   he claims he did not receive.  *See United States v. Golb*, 69 F.3d 1417, 1430 (9th

4   Cir. 1995) (ultimate question is whether there is reasonable probability that had

5   material been disclosed, result of proceeding would have been different such that

6   confidence in outcome is undermined).

7   **4.**   **Claim of Juror Bias**

8          Petitioner claims that his Sixth Amendment and due process rights were

9   violated by the inclusion of an allegedly biased juror.  During voir dire, Juror No.

10   1 indicated to the court that his eighteen month old nephew had his throat slit by

11   an intruder who was on PCP.  RT 258-259.  Juror No. 1 noted that the court

12   proceedings took place in San Francisco and that "[t]he judicial system" released

13   the assailant after six months.  *Id.*  The prosecutor asked Juror No. 1, "what I

14   need to know is whether or not you think any feelings you may have about

15   what's happened in the past in the system would affect the way you would judge

16   the evidence in this case and render a verdict?"  *Id.*  The juror replied, "No, it

17   wouldn't.  It would just have to be that the plaintiff would have to prove to me

18   that the defendant is guilty."  RT 259.  When later asked by defense counsel

19   whether he could be fair and impartial, Juror No. 1 replied, "I think I can be."

20   RT 263.

21          Defense counsel did not move to excuse Juror No. 1 for cause or use one

22   of its peremptory challenges to remove the juror.  At the end of jury selection,

23   defense counsel stated, "Your Honor, defense is satisfied with the jury as

24   constituted and we pass."  RT 361.

25   **A.**   **Legal Standard**

26          The right to a jury trial guarantees the accused "a fair trial by a panel of

27

28                                          23

1    impartial, 'indifferent jurors.'" *Nebraska Press Association v. Stuart*, 427 U.S.

2    539, 551 (1976) (citing *In re Murchison*, 349 U.S. 133, 136 (1955)); *Dyer v.*

3    *Calderon*, 151 F.3d 970, 973 (9th Cir. 1998). The bias or prejudice of even a

4    single juror violates a defendant's right to a fair trial. *United States v. Hendrix*,

5    549 F.2d 1225, 1227 (9th Cir. 1977). The presence of a biased juror cannot be

6    harmless; the error requires a new trial without a showing of actual prejudice.

7    *Calderon*, 151 F.3d at 973.

8       A juror is considered to be impartial "only if he can lay aside his opinion

9    and render a verdict based on the evidence presented in court." *Patton v. Yount*,

10    467 U.S. 1025, 1037 n. 12 (1984). The Constitution lays down no particular tests

11    and procedure to ascertain impartiality. Courts therefore have "broad discretion

12    and duty . . . to see that the jury as finally selected is subject to no solid basis of

13    objection on the score of impartiality." *Frazier v. United States*, 335 U.S. 497,

14    511 (1948); *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997) (the trial

15    judge has the authority and responsibility, either sua sponte or upon counsel's

16    motion, to dismiss prospective jurors for cause). Because determinations of

17    impartiality may be based in large part upon demeanor, federal habeas relief may

18    only be granted for a state court's failure to strike a juror for cause where there is

19    no fair support in the record for the trial court's determination that the juror was

20    unbiased. *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985).

21       **B.**     **Analysis**

22       Petitioner is not entitled to relief on this claim because there is ample

23    support for the trial court's determination that the juror was unbiased. The juror

24    was subjected to the rigors of voir dire, during which he indicated to the court, to

25    prosecution and to the defense that he would be fair and impartial if seated on the

26    jury. Neither the court, counsel, court personnel, nor other jurors reported

27

28                                  24

inappropriate behavior by the juror.  Given these facts, it cannot be said that there was no fair support in the record for the trial court's determination that the juror was unbiased.  *See Wainwright*, 469 U.S. at 424.

**5.**       **Juror No. 3's Inability to Comprehend English**

Petitioner contends that Juror No. 3's alleged inability to comprehend English deprived him of his right to a fair trial.  During voir dire, defense counsel questioned Juror No. 3 and the juror responded in English.  RT 343.  The juror stated that he was born outside of the United States, that English was his second language, that he had no problem with the English language, and that he learned English in his native country.  *Id.*

During deliberations, the trial court received a note from the jury foreperson indicating that two jurors had expressed that another juror was "having some difficulty with the instructions and the evidence due to the fact that English is not the juror's first language."  RT 1235.  Both counsel and prosecution met with the court outside the jury's presence.  The prosecutor moved for a hearing and investigation into the juror's ineligibility to serve based on insufficient knowledge of the English language.  RT 1235.   The court decided to voir dire the foreperson on this issue.  RT 126.  Defense counsel objected, arguing that pretrial voir dire demonstrated that no juror seated in the case had problems with the English language.  RT 1240.  The defense counsel then motioned for a mistrial, arguing that the note from the foreperson showed that there had been private communications between the jurors, about either the substance of the case or the nature of the deliberation process.  RT 1237.

Over defense counsel's objection, the court inquired of the foreperson about the juror's knowledge of the English language.  RT 1241.  In response to questioning by the court and the prosecutor, the foreperson stated that Juror No.

3 had shown some difficulty with the nuances of the English language and confusion over the instructions.  RT 1244.  The foreperson stated that the juror needed explanation on the difference between ordinary and ordinarily, and that the juror had misspelled prosecution.  RT 1244-1248.  The foreperson stated that "occasionally confusion has happened," but that the jury "could work through the problems."  RT 1247-1249.  After the questioning, defense counsel renewed his objection to the counsel's voir dire, contending that deliberation is a very delicate stage of the proceedings and that such questioning implied subtle coercion.  RT 1250.

The prosecutor requested that the court examine Juror No. 3 individually. RT 1250-1251.  Defense counsel argued that questioning the juror would be coercive and that "there was nothing on the record to indicate there was a language problem."  RT 1253.

The trial court denied the prosecutor's request to voir dire Juror No. 3. RT 1253.  The trial court also denied the defense's motion for mistrial.  *Id.*  The court pointed out that the foreperson stated that there were no "insurmountable" problems, that the jury was working through the problems and denied any further inquiry into the issue.  *Id.*

### A.    Legal Standard

"Due process means a jury capable and willing to decide the case solely on the evidence before it."  *See Smith v. Phillips*, 455 U.S. 209, 217 (1982). Persons who are not possessed of sufficient knowledge of the English language are incapable of discharging the duties of a juror.  *See e.g.,* 28 U.S.C. §§ 1865(b)(2)-(3); *People v. Szymanski*, 109 Cal. App. 4th 1126 (2003) ("Insufficient command of the English language to allow full understanding of the words employed in instructions and full participation in deliberations clearly

renders a juror unable to perform his duty within the meaning of Cal. Penal Code § 1089.").

Where jurors have been subjected to careful questioning there is a strong presumption of juror competence.  See *Smith*, 455 U.S. 209; *Tinsley v. Borg*, 895 F.2d 520 (9th Cir. 1990).  When a party fails to challenge the juror at the time of trial, "in order to prevail she must show cause for her failure to object and actual prejudice due to the juror's presence."  *Kimes v. United States*, 939 F.2d 776, 779 (9th Cir. 1991).

### B.    Analysis

Petitioner's claim is without merit because he does not show cause for his failure to object, nor demonstrate actual prejudice due to Juror No. 3's presence on the jury.  *See Kimes*, 939 F.2d at 779.  Petitioner was present during voir dire, at which time Juror No. 3 was questioned about his proficiency in English.  The juror responded to questions in English and answered in the affirmative when asked if English was his second language.  RT 343.  Petitioner had the opportunity at that time to object for cause or, alternatively, to use a peremptory strike. When the issue of Juror No. 3's ability to comprehend English was before the court, instead of objecting to the juror's presence, defense counsel stated that Juror No. 3 spoke English "very well" and insisted that the court refrain from questioning the juror on his comprehension of the English language.  Petitioner therefore cannot show "cause" for her failure to object.  Due to Petitioner's inability to show cause for his failure to object, the court need not further consider the merits of his argument.  *See United States v. Martinez-Salazar*, 528 U.S. 304 (2000) (implying that defendant must object to court's denial of for-cause challenge in order to preserve Sixth Amendment challenge to juror's service on petit jury).  But even if the court were to consider the merits, there is

nothing to suggest that Juror No. 3's inclusion on the jury prejudiced petitioner. *See Kimes*, 939 F.2d at 779. Nothing on the record compels the conclusion that the Juror No. 3 was incompetent.

### 6.    Ineffective Assistance of Trial Counsel

Petitioner contends that trial counsel's ineffective performance deprived him of his Sixth Amendment right of effective assistance of counsel. Petitioner alleges two claims of ineffective assistance of counsel: (1) trial counsel was ineffective for preventing Petitioner from testifying at trial; and (2) trial counsel was ineffective for failing to move to introduce police reports showing the victim's prior violent acts.

### A.    Legal Standard

The Sixth Amendment right to counsel guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a Sixth Amendment ineffective assistance of counsel claim, Petitioner must establish that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Petitioner also must establish that he was prejudiced by counsel's deficient performance and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings. *Id.*

A difference of opinion as to trial tactics does not constitute denial of effective assistance. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981). A trial attorney has wide discretion in making tactical decisions. *Turk v. White*, 105 F.3d 478, 481 (9th Cir. 1997) (deference to trial counsel's discretion includes decision to abandon inconsistent or unsupported defenses).

**B.** **Analysis**

When a defendant, "on advice of counsel, knowingly and voluntarily, if reluctantly, refrained from testifying in his own defense," no constitutional error occurs. *Campbell v. Vaughn*, 209 F.3d 280, 291 (3rd Cir. 2000). Even if Petitioner's counsel forcefully urged Petitioner not to testify, the record establishes that Petitioner was repeatedly made aware that only he could make the final decision. During voir dire, with Petitioner in attendance, defense counsel and the trial judge on several occasions explained to prospective jurors of Petitioner's right not to testify at trial. In one exchange, defense counsel stated, "If Mr. Brown chose not to testify, and the judge instructed you that you couldn't consider that, would you follow that rule of law?" RT 261. Moreover, at defense counsel's request, the trial court instructed the jury in the language of CALJIC Nos. 2.60 (Defendant Not Testifying-No Inference of Guilt May Be Drawn"). RT 1211-12. On this record, Petitioner cannot establish constitutional error.

Petitioner's argument with respect to counsel's failure to introduce police reports showing the victim's prior violent acts is also without merit. A court need not address the question of counsel's deficient performance if it finds that the Petitioner was not prejudiced thereby. *See Strickland*, 466 U.S. at 697. The Court denied this claim on the merits in section 2, above, finding the evidence was mostly irrelevant, and that its exclusion did not prejudice Petitioner at trial. As such, no prejudice is found with regard to this claim.

**7.** **Ineffective Assistance of Appellate Counsel**

Petitioner claims that appellate counsel provided ineffective assistance of counsel for failing to raise on appeal the claims Petitioner now raises in his habeas petition.

### A.     Legal Standard

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *See Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989); *United States v. Birtle*, 792 F.2d 846, 847 (9th Cir. 1986).  A defendant must therefore show that appellate counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for appellate counsel's unprofessional errors, he would have prevailed on appeal.  *Miller*, 882 F.2d at 1434 (citing *Strickland*, 466 U.S. at 688, 694; *Birtle*, 792 F.2d at 849).

An appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by the defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller*, 882 F.2d at 1434 n.10.  The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  *See Miller*, 882 F.2d at 1434 (footnote and citations omitted).  Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason--because he declined to raise a weak issue.  *See id.*

### B.     Analysis

Appellate counsel did not raise on appeal Petitioner's claims of prosecutorial misconduct, juror bias, juror incompetence and ineffective assistance of trial counsel.  As discussed above,  however, these claims are without merit.  An appellate lawyer's failure to raise a meritless claim is neither

unreasonable nor prejudicial. *See Miller*, 882 F.2d at 1434 (footnote and citations omitted).  Petitioner accordingly did not receive ineffective assistance of appellate counsel nor was he prejudiced by the manner in which his appeal was conducted.  Habeas relief is therefore denied as to this claim. *See id.*

## **CONCLUSION**

After a careful review of the record and pertinent law, the petition for writ of habeas corpus is DENIED.  The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

Dated: January 30, 2007

_____
JEFFREY S. WHITE
United States District Judge

31